UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
MILLER MARINE SERVICES, INC.,

               Plaintiff,

                                           MEMORANDUM AND ORDER
    -against-                          04 CV 5679 (ILG)

TRAVELERS PROPERTY CASUALTY
INSURANCE CO. et al.,

               Defendants.
---------------------------------------------------x
GLASSER, United States District Judge:

## INTRODUCTION

        This case arises out of the sinking of a commercial vessel which plaintiff owned

called the M/V James C. Miller (the "Vessel") during the night of January 8, 2004 and

the morning of January 9, 2004. Defendants issued a marine hull and protection and

indemnity insurance policy to plaintiff for the Vessel. Following the sinking of the

Vessel, plaintiff made a claim under that policy, which was denied by defendants.

Plaintiff argues in this lawsuit that defendants breached the policy and they are

therefore liable for the loss caused by the sinking of the Vessel.

        Defendants Travelers Property Casualty Insurance Company ("Travelers"),

Atlantic Mutual Insurance Company ("Atlantic Mutual"), Zurich Insurance Company

("Zurich") and Centennial Insurance Company ("Centennial") (collectively,

"defendants") have filed this motion pursuant to Fed. R. Civ. P. 56 asserting that they

are entitled to summary judgment on the claims of plaintiff Miller Marine Services, Inc.

("plaintiff") for breach of contract and a declaration that plaintiff should be covered

under the maritime insurance policy between the parties. Defendants argue that

plaintiff cannot establish that it is entitled to compensation under the policy based on its plain language. In opposition, plaintiff has cross-moved for summary judgment, arguing that the policy was intended to provide "all risk" coverage to Miller Marine, and that it is entitled to summary judgment because it is undisputed that the Vessel sank because of valves being left open allowing water to flood the engine compartment and the crew quarters.

For the reasons set forth below, defendants' motion is granted and plaintiff's cross-motion is denied.

## BACKGROUND

Defendants Zurich and Centennial issued Marine Hull and Protection & Indemnity Policy No. 121-002-910-4635 (the "Policy") to plaintiff effective from August 31, 2003 to August 31, 2004. (Defs. Rule 56.1 Statement ¶ 1, Compl. ¶ 14). The Hull insurance policy is the marine equivalent of general property insurance while the protection and indemnity insurance policy is the marine equivalent of general personal injury insurance. The Hull section of the Policy pursuant to which plaintiff filed this suit was underwritten by Zurich and Centennial. (Defs. Rule 56.1 Statement ¶ 2 & Exh. A (attaching the Policy)). Atlantic Mutual is an underwriter only with respect to the Protection and Indemnity section of the Policy.[1] (Defs. Rule 56.1 Statement ¶ 3 & Exh. A). The Policy was negotiated, prepared, and delivered to plaintiff through its broker, Hilb, Rogel & Hobbs, Inc., in New York State. (Compl. ¶ 4). Plaintiff is the owner of the

---

[1]According to defendants, Travelers has no relationship to plaintiff in connection with the Vessel. (Defs. Rule 56.1 Statement ¶ 4). That contention is vigorously disputed by plaintiff. However, it does not need to be resolved by the Court because, as set forth below, it is granting defendants' motion for summary judgment on the merits, a decision which would relieve Travelers of liability even assuming it was a proper party to this lawsuit.

Vessel.  (Id. ¶ 5).  All of the parties are either residents of New York and/or incorporated under the laws of the State of New York.  (Compl. ¶¶ 5-13).

In January 2004, the Vessel was docked at the Great Lakes Dredge & Dock in New Haven, Connecticut.  (Defs. Rule 56.1 Statement ¶ 6).  The Vessel sank during the night of January 8, 2004 when it was unmanned.  (Id. ¶ 7).  In the early morning of January 9, at approximately 6:15 a.m., Port Captain Bradley Primer ("Primer"), one of plaintiff's employees, reported that he observed that the Vessel had partially sunk and was sinking.  (Affidavit of James Miller ("Miller") sworn to August 8, 2005 ("Miller Aff.") ¶ 17).  The New Haven, Connecticut Police Department (the "Police") was called to the scene, and with the assistance of the United States Coast Guard (the "Coast Guard"), they investigated the sinking.  (Id. ¶¶ 18, 20).

In a "case incident report," the Police wrote that in an interview with Primer, he informed them that two "employees with extensive knowledge of the [Vessel] were recently terminated, Mr. Chris Hawk and Mr. Hank Wawryck.  He states that they were recently denied unemployment money and were extremely disgruntled.  Upon checking the perimeter of the yard, the rear fence which is behind the office, is easily accessible, the barbed wire which once lined the top of the fence is worn and hanging off, making it easy to scale.  Mr. Primer stated that if you knew what you were doing, as both former employees did, the task of opening the valves and leaving without being detected would take about 15 minutes."  (Id. Exh. 4).  In its report, the Coast Guard opined that "it is unusual to find" the sea chest valves "open" as they were, along with other suspicious circumstances, for example, a missing starboard pump.  (Id.).  Therefore, it was "not unreasonable to conclude that an individual with vessel experience, and possibly with

experience on this particular vessel, may have tampered with the valves in a deliberate attempt to sink the vessel." (Id.). Nonetheless, the Coast Guard concluded that no definitive findings could be made about who caused the valves to be opened causing the sinking of the Vessel, noting that it was an "act of barratry and/or environmental terrorism." (Id. Exh. 5).

The insurers were notified of the sinking, and they engaged Marine Safety Consultants, Inc. to survey the damage and to investigate its cause. (Miller Aff. ¶ 22). Among other things, Marine Safety Consultants opined that the Vessel sank because it took "on water as a result of [five] valves being open allowing water to flood the engine compartment and the crew quarters." (Id. Exh. 6, at 3).

Miller, the owner, operator and president of Miller Marine, conducted an investigation into the cause of the sinking of the Vessel shortly after the occurrence. (Id. ¶¶ 28-42). Based upon information received from Marine Safety Consultants, the Police, and the Coast Guard, and his investigation, Miller determined that crew member, Delroy Needham, left the five valves open on the Vessel after participating in the performance of routine maintenance and service on the Vessel's packing glands.[2] (Id. ¶¶ 38, 42). Further, plaintiff's putative marine insurance expert, Peter A. Mello, opined that based on his twenty years of professional experience in the insurance industry, and after reviewing all relevant documents, the sinking of the Vessel was a covered occurrence under the terms of the Policy. (Affidavit of Peter A. Mello sworn to August 9, 2005 ¶¶ 33-34).

---

[2]"The packing glands are found behind the open sea-chest valves and drain valves on the Vessel." (Miller Aff. ¶ 39).

In response to an interrogatory which defendants put to plaintiff asking it to "[d]escribe in detail how the Sinking [of the Vessel] occurred," plaintiff noted, consistent with the Police incident report, the Coast Guard report, and the marine survey report, "that this was, is and shall remain, an unexplained and, most probably, unexplainable fortuitous occurrence." (Id. Exh. C, attaching plaintiff's responses to defendants' first set of interrogatories dated May 2, 2005, at 3). In responses to defendants' interrogatories (the "Interrogatories"), plaintiff also declared that "the direct cause of the sinking was the ship taking on water while docked ... [in] New Haven[,] Connecticut." (Id.).

Defendants denied coverage to plaintiff by letter dated, February 4, 2004, stating that the sinking of the Vessel "was caused by two former Miller Marine employees who were disgruntled about failing to obtain benefits at an earlier unemployment hearing and who consequently went aboard the vessel illegally with the intention of sinking her." (Miller Aff. ¶¶ 31-32, Exh. 8). Furthermore, defendants wrote, "there has been no evidence presented to show that the valves being left open was caused by a barratry which is a term that refers to acts committed by a vessel's current crew members." (Id.).

The Hull policy defines "Perils" as follows: "Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Waters named herein, Fire, Lightning, Earthquake, Assailing Thieves, Jettisons, Barratry of the Master and Mariners and all other like Perils that shall come to the Hurt, Detriment or Damage of the Vessel." (Defs. Rule 56.1 Statement Exh A). The Hull policy also contains an "Additional Perils" clause, commonly referred to as the Inchmaree clause. (Id.). According to Miller, at the time plaintiff was "considering

5

purchasing the" Policy, he "read the terms and conditions of the [P]olicy and understood the phrase 'all other like Perils that shall come to the Hurt, Detriment or Damage of the Vessel' ... to provide insurance coverage for the subject Vessel for all risks or perils including sinking, unless specifically and expressly excluded."  (Miller Aff. ¶ 13).

The parties engaged in limited discovery prior to the filing of the pending motions.

## DISCUSSION

### I.        Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Therefore, the nonmoving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  However, when evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." L.B. Foster Co. v. American Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

6

**II.  Whether the Policy is a Named Perils Policy or an All Risk Policy**

As a threshold matter, the parties disagree whether the Policy constitutes a named perils policy or an all risk policy.  If the Court concludes that the Policy is a named perils policy, then plaintiff has the burden of coming forward with a preponderance of competent evidence that the sinking of the Vessel was caused by a covered occurrence.  <u>Northwestern Mutual Life Ins. Co. v. Linard</u>, 498 F.2d 556, 561 (2d Cir. 1974).  On the other hand, if the Court determines that the Policy is an all risk policy, then the burden is on defendants, as the insurers, to show, by a preponderance of evidence, that an exception to coverage applies.  <u>Id.</u> & n.5 (citing <u>Redna Marine Corp. v. Poland</u>, 46 F.R.D. 81 (S.D.N.Y. 1969)).  Stated differently, an all risk policy places the burden on the insured to establish only the existence of the all risk policy and its loss.  Then the burden shifts to the insurer to show that the coverage of the loss comes within one of the exceptions.  <u>Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.</u>, 505 F.2d 989, 999 (2d Cir. 1974).

In support of its position that the Policy is an all risk policy, plaintiff cites three cases, each of which the Court finds inapposite.  First, plaintiff states that <u>International Ship Repair & Marine Serv., Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 944 F. Supp. 886 (M.D. Fla. 1996), is the case which establishes the standards "which modern [c]ourts follow with respect to the proper interpretation of a marine insurance contract."  (Pl. Mem. at 12).  The clause in <u>International Ship Repair</u>, however, was much different from the one presented in this case, providing as follows: "TOUCHING THE ADVENTURES AND PERILS which we, the said Assures, are contented to bear and take upon us, they are of Seas, Rivers, Lakes, Harbours, Men-of-War, Fire Enemies, Pirates, Thieves,

7

Jettisons, Letters of Mart or Counter Mart, Surprisals, Takings at Sea, Arrests,

Restraints, Detainments of all Kings, Princes and Peoples, of what nation, condition or

quality soever, Barratry of the Master and Mariners, Explosions, Riots, <u>or other causes</u>

<u>of whatsoever nature arising either on shore or otherwise</u>, causing Loss of or injury to

the Property hereby insured, and <u>of all other Perils, Losses, and Misfortunes that have</u>

<u>or shall come to the Hurt, Detriment, or Damage of the said Dock, & c., or any part</u>

<u>thereof</u>." 944 F. Supp. at 891 (emphasis added). The <u>International Ship Repair</u> court

held that the clause was part of an all risk policy and not a named perils policy because

"[a]ny time an insurer decides to draft an insurance policy which provides coverage for

'other causes of whatsoever nature' and 'all other perils, losses and misfortunes,' it

intends to provide 'all risk' coverage to its insured, not simply a covered 'perils' policy."

<u>Id.</u> at 892 (citing <u>Mellon v. Fed. Ins. Co.</u>, 14 F.2d 997, 1001 (S.D.N.Y. 1926) (the

inclusion of the phrase "other causes of whatsoever nature" covers "all risks" and, thus,

"[t]he perils clause is an all risk clause")). The language in the Policy here is peculiarly

inapposite to that found in <u>International Ship Repair</u> because it includes the phrase

"and all other like perils" and not "all other perils."

     Second, in <u>Ingersoll Milling Machine Co. v. M/V Bodena</u>, 619 F. Supp. 493, 498

(S.D.N.Y. 1985), the policy stated as follows: "Touching the adventures and perils which

this Company is content to bear, and take upon itself in this voyage, they are of the Seas,

Fires, Assailing Thieves, Jettisons, Barratry of the Master and Mariners, <u>and all other</u>

<u>like perils, losses and misfortunes</u>, that have or shall come to the hurt, detriment or

damage of the said goods and merchandise or any part thereof." (emphasis added).

However, that policy also contained the following language (not found in this case),

under a section styled "Broader Terms," which stated that the policy holder was also "insured against all risks of physical loss or damage <u>from any external cause irrespective of percentage, including theft, pilferage and/or non-delivery</u>, but excluding, nevertheless, the risks of war, strikes, riots, seizure, detainment, confiscation, requisition, nationalization and other risks excluded by the … warranties in the printed portion of the policy …." <u>Id.</u> at 499 (emphasis added).  Therefore, the court's finding in <u>Ingersoll Milling Machine</u> that the policy was all risk is borne out by the unambiguous language which expressly protected the insured against loss or damage "from any external cause," language which is similar to the policy language in <u>International Ship Repair</u>.  The language in these cases is therefore much different than the language in the Policy here.

Third, in <u>St. Paul Fire & Marine Ins. Co. v. Christiansen Marine Inc.</u>, 893 So.2d 1124 (Ala. 2004), the Supreme Court of Alabama interpreted a clause in a marine insurance policy similar to the one in this case.  In concluding that the policy was an all risk policy, the court relied on <u>International Ship Repair</u> and wrote in conclusory fashion that "[i]n this case, St. Paul issued an insurance policy to Dogwood that provided hull coverage for 'all other like perils that shall come to the hurt, detriment or damage of the vessel named herein.'  This language created an all-risks policy."  Id. at 1128 & n.7.  However, the court's conclusion is at odds with the holding in <u>International Ship Repair</u> because the policy before the Supreme Court of Alabama, like the one here, did not include a catch-all phrase insuring against loss as a result of "all other perils," "other causes of whatsoever nature," or similar language to that effect found in <u>International Ship Repair</u>.  Therefore, this Court declines to follow the reasoning of

9

Christiansen Marine.

Where an insurance policy, like the one here, sets forth a list of conditions against

which insurance is provided, and also protects against loss suffered due to "all other like

Perils," that clause has only one reasonable interpretation, namely, to protect against

loss suffered on account of harm similar in nature to the conditions expressly insured

against.  Otherwise, the phrase "like Perils" would be rendered superfluous, which the

Court must guard against when interpreting unambiguous contractual language.[3] See

Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 165 (2d Cir. 2005) ("In

interpreting an insurance contract under New York law, a court must strive to 'give

meaning to every sentence, clause, and word.'") (citing and quoting Travelers Cas. &

Sur. Co. v. Certain Underwriters at Lloyd's of London, 96 N.Y.2d 583, 594, 734 N.Y.S.2d

531, 760 N.E.2d 319 (2001)).  Accordingly, the Court finds that the Policy in this case is a

named perils policy.  Plaintiff, therefore, has the burden of proof to establish, inter alia,

that "both the loss and the peril which caused it fall within the meaning of the policy

terms."  Antilles Steamship Co., Ltd. v. Members of the Am. Hull Ins. Syndicate, 733

F.2d 195, 199 (2d Cir. 1984).

**III.    Whether There are Disputed Issues of Fact Relating
to Defendants' Duty to Insure Plaintiff for the Sinking of the Vessel**

As a threshold matter, defendants argue that plaintiff's claims for a declaratory

judgment and for breach of the Policy should be summarily resolved in their favor based

---

[3]It is for the reason that the Court finds the language in the Policy to be unambiguous that it can
decide this issue as a matter of law on summary judgment.  See, e.g., Brass v. Am. Film Techs., Inc., 987
F.2d 142, 148-49 (2d Cir. 1993) (a court may interpret the contract and grant summary judgment where
the contract language is "plain and unambiguous").  Therefore, the intent of the parties, including Miller's
affidavit testimony that he believed the Policy was an all-risk policy when he signed the contract, is
irrelevant to the Court's analysis.

on the admission plaintiff makes in the Interrogatories that it is unable to provide any evidence as to how the Vessel sank.[4]  Initially, the Court notes that New York law applies to this dispute because, as indicated above, the Policy was negotiated, prepared and delivered in New York State and entered into by New York residents.  See, e.g., Antilles Steamship Co., 733 F.2d at 198 (state law is controlling on marine insurance issues) (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 321 (1955)).  "To the extent that no New York precedent exists, the maritime nature of this insurance contract dictates that [the Court] anticipate that New York courts would look to English law in view of the 'special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business.'"  Id. (citing and quoting Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 493 (1924) (Holmes, J.)).

As discussed above, the perils clause of the Policy "is that of the standard British hull policy" and is "not a so-called 'all-risk' policy wherein all losses attributable to external causes are covered, absent specific exclusion thereof."  Northwestern Mutual Life Ins. Co. v. Linard, 498 F.2d 556, 560-61 (2d Cir. 1974) (citations omitted).  The burden of proof therefore rests squarely on plaintiff.  Antilles Steamship Co., Ltd., 733 F.2d at 199.

---

[4]Jurisdiction of the Court is predicated on the Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333, the claim being within the meaning of Fed. R. Civ. P. 9(h).  "The Supreme Court explained in 1871 that, in determining whether admiralty jurisdiction applies to a *contract* dispute, 'the fundamental inquiry [has been] whether the contract was or was not a *maritime contract*.... and whether maritime or not maritime depended ... on the *subject-matter* of the contract.  If that was maritime the contract was maritime."  Sirius Ins. Co. (UK) Ltd. v. Collins, 16 F.3d 34, 36 (2d Cir. 1994) (holding admiralty jurisdiction applicable to claims arising out of the theft of a pleasure boat that was removed from the water for winter storage) (citing and quoting Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 29, 20 L. Ed. 90 (1871)) (emphasis in original).  "It has long been settled that the maritime jurisdiction applies to all contracts ... which relate to the navigation, business, or commerce of the sea."  Id. (citation and internal quotation omitted).  Here, there is no question that the Policy constitutes a maritime contract and therefore plaintiff's claim is litigated within the Court's maritime jurisdiction.

The phrase "peril of the sea" is a term of art in maritime insurance law. The primary requirement for a finding of the existence of a peril of the sea is that "damage be done by the fortuitous action of the sea." New York, New Haven & Hartford R.R. Co. v. Gray, 240 F.2d 460, 464 (2d Cir.) (citation and internal quotation omitted), cert. denied, 353 U.S. 966 (1957). For example, "where cargo was damaged by the incursion of seawater through a hole in a pipe gnawed by rats, the House of Lords held this to be a peril of the seas." Gray, 240 F.2d at 464 (citations and internal quotation omitted). In Gray, the insured recovered for damage incurred when water leaked into a moored carfloat causing the vessel to list and settle, with a resultant loss of cargo. Id. Similarly, the New York Court of Appeals has held that the phrase "perils of the sea" as utilized in a marine insurance policy "is not limited to extraordinary perils ... but it includes only a *sea* damage, occurring at sea, a peril *of* the sea. A peril *on* the sea is not enough." See Cary v. Home Ins. Co., 235 N.Y. 296, 300, 139 N.E. 274, 275 (1923) (emphasis in original); see also James A. McAllister & Co. v. Western Assur. Co. of the City of Toronto, 218 A.D. 564, 570, 218 N.Y.S. 658, 664 (1926) (1st Dep't 1926) ("it is not necessary that there should be the action of the sea, wind, or waves, violent or otherwise, to cause a peril of the sea, but that a truly accidental occurrence, peculiar to the sea, such as the entry of the sea water through the seams of a vessel, which have opened, or through a hole in her hull (neither occurrence happening through design), constitutes a peril of the sea, within the meaning of a policy of marine insurance"). A peril of the sea, nonetheless, has been interpreted to include the negligence of employees of a vessel. See, e.g., CPH Int'l, Inc. v. Phoenix Assur. Co. of N.Y., 1994 WL 259810, at *6 (S.D.N.Y. June 9, 1994) (citations omitted).

Therefore, the issue to be decided is "[w]hether the loss resulted from a 'necessary incident' of the venture – *i.e.*, from ordinary wear and tear" or the defective, deteriorated or decayed condition of the vessel, or some other "non-fortuitous cause" – or from a peril of the sea, *i.e.*, "an accident which could not be foreseen," including the negligence of the vessel's employees. Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co., 314 F.2d 753, 756 (2d Cir.) (stating that under the circumstances of the case, "the swells caused by the passing freighter were unanticipated and extraordinary, and constituted a 'peril of the sea' within the meaning of the policy"), cert. denied, 375 U.S. 819 (1963). If the accident happened as a result of the former, the plaintiff cannot recover under the Policy, but if it happened as a result of the latter, it may recover.

In addition to presenting evidence that the sinking of the Vessel was caused by a peril of the sea, plaintiff must also, at minimum, raise a genuine issue of material fact that the loss was "proximately caused by the peril insured against and claimed under" the Policy. Northwestern Mutual Life Ins. Co., 498 F.2d at 561 (citing Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co., 302 U.S. 556 (1938)) (internal quotation omitted). Proximate cause is applied more strictly in maritime insurance cases than in negligence cases. See Blaine Richards & Co., Inc. v. Marine Indemnity Ins. Co. of Am., 635 F.2d 1051, 1054 (2d Cir. 1980). Courts are obligated to determine the "predominant or determining" or the "real efficient" cause of the loss. Id. at 1054. Proximate cause is not determined by relying on "but for" causation. Id. In Muller v. Globe & Rutgers Fire Ins. Co., 246 F. 759, 762-63 (2d Cir. 1917), the Second Circuit articulated proximate cause as follows:

That cause is proximate which sets the other causes in motion;

> only when causes are independent is the nearest in time looked to....
> If there is an unbroken connection between act and injury, the
> act causes the injury; an intervening act is not the proximate cause
> of injury, unless it is efficient to break the causal connection.

Therefore, when ascertaining the legal cause of loss for insurance purposes, the Court must look to the "real efficient cause" of the occurrence rather then the single cause nearest in time to the loss.  Blaine Richards & Co., 635 F.2d at 1054 (quotation and citation omitted) (noting that a determination of proximate cause is a matter of "applying common sense and reasonable judgment as to the source of the loss alleged.").

Plaintiff has failed to create a genuine issue of material fact on both issues – whether the sinking of the Vessel was caused by a peril of the sea, and whether its loss was proximately caused by the peril insured against.  Plaintiff's response to the Interrogatories reveals that it has no knowledge, and will not be able to obtain any information during discovery, about how the Vessel sank.[5]  Although plaintiff has submitted an affidavit from its president, and a putative expert, indicating their belief that the sinking of the Vessel was caused by an occurrence insured against, this "belief" is not predicated on any admissible evidence.  Miller, who was not piloting, or even on board the Vessel on the evening when it sank, states without any support that a crew member left open the valves after performing routine maintenance.  (Miller Aff. ¶ 42).  However, this bald assertion contradicts Miller's own employee, Primer, who stated to Police shortly after the sinking that he was the last one to disembark from the Vessel on January 8.  (Miller Aff. Exh. 4).  Moreover, Primer told the Police of his belief that two

---

[5]Plaintiff's suggestion that defendants' motion should be denied pursuant to Fed. R. Civ. P. 56(f) is unpersuasive because Miller Marine has failed to submit an affidavit stating the reasons how further discovery will allow it to create a genuine issue of material facts on its claims.

former Miller Marine employees who were denied unemployment compensation following their termination had both the motive and means to sabotage the Vessel. (Id.). The Coast Guard report also posits that as a likely cause of the sinking. (Id. Exh. 5). Therefore, until Miller submitted his affidavit in this matter, no one had suggested that a crew member was responsible for the sinking. In fact, a review of all the reports written following the sinking, including those from the Police and Coast Guard, conclude that the only plausible explanation for the sinking was the intentional acts of third parties, plaintiff's former employees. Because plaintiff's expert relied solely on Miller's testimony for his conclusion that the sinking was a covered occurrence, Mr. Mello's affidavit, like Miller's, cannot raise a genuine, material issue of fact as to who caused the sinking.

In short, plaintiff is unable to raise a genuine issue of material fact on the issue whether the Vessel sank because of a peril of the sea or, for example, for reasons not covered by the Policy, including the malicious and intentional actions of third parties, including Miller Marine's former employees. College Point Drydock & Supply Co. v. National Union Fire Ins. Co. of Pittsburgh, PA, 392 F. Supp. 277 (S.D.N.Y. 1974), is peculiarly apposite, a case in which the plaintiffs sought to recover against an insurer for the sinking of a barge under a perils of the sea clause in a maritime policy. The court entered judgment against the plaintiffs because there was "a total lack of credible evidence as to the cause of the sinking" of the barge. Id. at 279. Similarly, here, plaintiff has failed to offer any admissible evidence of the cause of the sinking of the Vessel other than that it was caused by the intentional acts of two former Miller Marine employees.

Moreover, as in College Point Drydock & Supply Co., plaintiff is unable to

15

establish that its loss was proximately caused by the peril insured against. While the plaintiff asserts in the Interrogatories that "the direct cause of the sinking was the ship taking on water," <u>see</u> Defs. Rule 56.1 Statement Exh. C at 3, this is not the "real efficient cause" of the loss but rather was the cause nearest in time to the loss. It is obvious that a vessel which sinks does so because it takes on water. However, the Hull policy entered into between the parties affords plaintiff a recovery for the sinking only if it can establish a causal connection between the peril it was insured against and the loss. The Interrogatories demonstrate that plaintiff is unable to satisfy this burden.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety and plaintiff's cross-motion for summary judgment is denied. The Clerk of Court is respectfully directed to enter judgment for defendants and to close this case.

SO ORDERED.

Dated:      Brooklyn, New York
           September 19, 2005

S/ _____
    I. Leo Glasser